# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Dupree Raanna Tesmer, | Civ. No. 13-1402 (JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM**<br>**OPINION AND ORDER** |
| Carolyn W. Colvin,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

Gerald S. Weinreich, Esq., Weinrich Law Office, counsel for Plaintiff.

Ann M. Bildtsen, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Dupree Raanna Tesmer seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability insurance benefits.  This matter is before the Court on the parties' cross-motions for summary judgment.  (Doc. Nos. 14, 26.)  The parties have consented to this Court's exercise of jurisdiction over all proceedings in this case pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (Doc. Nos. 10, 11.)  For the reasons stated below, the Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment.

## BACKGROUND

### I.     Procedural History

Plaintiff filed an application for disability insurance benefits on September 23, 2010, alleging a disability onset date of April 1, 2009.  (Tr. 128–29.)  The Social Security Administration ("SSA") denied Plaintiff's claims initially.[1] (Tr. 88–92.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), and the hearing was held on March 21, 2012.  (Tr. 93–94, 65–85.)  On March 29, 2012, the ALJ issued an unfavorable decision on Plaintiff's application.  (Tr. 48–64.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on June 6, 2013.  (Tr. 1–5.)  Denial by the Appeals Council made the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.

### II.    Background

Plaintiff, born on November 19, 1979, was 29 years old on her alleged onset date of disability, April 1, 2009.  (Tr. 59, 128.)  Plaintiff was involved in a motor vehicle accident in 1993 and injured her wrists, later requiring ligament reconstruction of the left wrist and arthroscopic debridement of the right wrist. (Tr. 406).  After surgery, Plaintiff worked as a receptionist, data entry clerk, and administrative assistant.  (Tr. 231.)  In 2009, she alleged disability due to wrist

---

[1]     Because Plaintiff filed her disability application in Missouri, a state that participates in a disability prototype test, she was not required to request reconsideration of the initial determination before proceeding to an administrative hearing.  (*See* Doc. No. 27, Def's Mem. in Supp. of Mot. for Summ. J. 2, n.1.)

injuries, low back pain, arthritis, knee pain, and depression.  (Tr. 186.)  She

worked two temporary jobs after her alleged disability onset date – data entry

from September 2009 through December 2009, and receptionist from July 14,

2010, through September 3, 2010.  (Tr. 171.)

Plaintiff completed a function report for the Social Security Administration

("SSA") on October 18, 2010.  (Tr. 216–23.)  She described her daily activities,

which included checking email, watching television, listening to the radio, eating,

letting her dogs out, napping, and using a computer for thirty minutes.  (Tr. 216.)

She indicated that she had difficulty with personal care due to wrist pain, but she

loaded her dishwasher once a week, and she could do laundry if someone

carried the basket for her.  (Tr. 217–18.)  She also noted that she was able to

drive, and she attended church weekly, went to the grocery store twice a week

with assistance, and went to a mall every two weeks.  (Tr. 219–20.)

In her function report, Plaintiff stated that back pain limited her ability to

squat, bend, kneel, climb stairs, and walk.  (Tr. 221.)  She also stated that she

was prescribed wrist braces for her wrist pain but she did not always use them.

(Tr. 222.) Plaintiff indicated that she followed instructions well and got along with

authority figures, but she handled stress poorly.  (Tr. 221–22.)

Plaintiff's spouse, Joshua Jones, completed a third-party function report,

corroborating Plaintiff's report.  (Tr. 203–11.)  He indicated that at times he had to

help her with personal grooming.  (Tr. 205.)

A.    **Medical Records**

On February 20, 1998, two and one-half years after her wrist surgeries, Plaintiff followed up at Mayo Clinic "in anticipation of some legal event." (Tr. 406.)  Her surgeon, Dr. P.C. Amadio, had last seen Plaintiff one year earlier. (*Id.*)  At that time, she had wrist pain interfering with rigorous activities such as cartwheels, push-ups, and pull-ups.  (*Id.*)  At the February 20, 1998 meeting, her symptoms were about the same, and she wanted to know what permanent restrictions she would have using her wrists.  (*Id.*)  On examination, Plaintiff had some pain in her wrists but objective test results and x-rays were normal.  (*Id.*)  Dr. Amadio diagnosed Plaintiff with bilateral wrist pain and opined that Plaintiff could function as her comfort would permit.  (*Id.*)  Dr. Amadio noted that it would be reasonable for her to avoid activities that caused disabling pain, but she would not be doing any harm to her wrists by doing an activity that caused only mild discomfort, even if the activity was vigorous.  (*Id.*)

Nine years later, on September 13, 2007, Plaintiff was evaluated for wrist pain by Dr. James Eckenrode at Columbia Orthopaedic Group.  (Tr. 372–73.) Plaintiff had full pronation and supination in her left and right wrists, and she could flex and extend her left wrist to sixty degrees.  (Tr. 372.)[2]  In her right wrist, she had full range of pronation and supination, and somewhat better flexion on

---

[2]    Normal extension and flexion of the wrist is seventy to seventy-five degrees. Normal Range of Motion Reference Values, American Society for Surgery of the Hand, *available at* http://www.assh.org/Public/HandAnatomy/Anatomy/Pages/Normal-Range-Motion.aspx.

extension.  (*Id.*)  The x-ray of her right wrist appeared normal, and the x-ray of her left wrist showed some significant narrowing of the lunotriquetral joint with an irregularity, probably posttraumatic arthritis.  (*Id.*)  In addition, there was significant overgrowth of the ulnar styloid on the left, possibly causing ulnar impingement.  (*Id.*)  Dr. Eckenrode noted that as a last resort, she could have an ulnar shortening osteotomy to lessen the impingement, but there were no guarantees of improvement.  (Tr. 372–73.)

Several months later, Plaintiff fell and hurt her back.  (Tr. 316.)  She had a lumbar MRI, which showed some desiccation and degeneration of the L5-S1 disc without significant stenosis.  (Tr. 324–25.)

On September 21, 2009, Plaintiff was evaluated for low back pain by Dr. Jason Rosenberg at the University of Missouri Physical Medicine & Rehabilitation Clinic.  (Tr. 294–97.)  Plaintiff indicated that her back pain started when she was in high school, but she had a significant exacerbation after falling on ice in 2007.  (Tr. 295.)  She stated that she had some improvement with an exercise program but continued to have exacerbations of pain every two or three months, and she reported that medication helped only for a few days.  (*Id.*)  Plaintiff also stated that she had neck and shoulder pain 90% of the time.  (*Id.*)  She stated that she did not sleep well and did not feel rested upon waking.  (Tr. 295–96.)  At the time of examination, she was employed in data entry and did not have any work restrictions.  (Tr. 296.)  Plaintiff also reported that she saw a therapist for depression, and she had lost thirty pounds due to stress.  (*Id.*)

During this visit, Plaintiff was alert, cooperative, and in no acute distress. (Tr. 296.)  Dr.  Rosenberg noted that her gait was normal, her muscle strength, sensation, and reflexes of the upper and lower extremities were also normal, and there was no clonus[3] at her wrists or ankles.  (Tr. 297.)  She had full range of motion of the lumbar spine and negative straight leg raise tests.  (*Id.*)  In addition, she exhibited fourteen fibromyalgia tender points.  (*Id.*)  Dr. Rosenberg's assessment was chronic pain/arthralgias likely secondary to fibromyalgia or somatization and depression.  (*Id.*)  He prescribed Cymbalta and physical therapy.  (*Id.*)  He also ordered lab tests to rule out a rheumatologic disorder. (*Id.*)

One month later, in follow up for chronic pain, Plaintiff told Dr. Rosenberg that she improved about 25% using Cymbalta.  (Tr. 292–93.)  But she had been unable to increase the dosage of Cymbalta due to side effects of daytime fatigue and lightheadedness.  (Tr. 292.)  On examination, she was alert, cooperative, and in no acute distress.  (*Id.*)  Dr. Rosenberg noted that there were no abnormal findings and recommended therapy for depression, and he referred Plaintiff to a rheumatologist due to a positive FANA test.[4]  (*Id.*)  At that time, Plaintiff had not

---

[3]     Clonus is a form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession seen with, among other conditions, spasticity and some seizure disorders.  *Stedman's Medical Dictionary* 364 (27th ed. 2000).

[4]     The fluorescent antinuclear antibody test ("FANA") is used to detect abnormal antibodies, the presence of which indicates an autoimmune disorder.
(Footnote Continued on Next Page)

started physical therapy, explaining that the cost and her schedule were preventing her from doing so.  (*Id.*)

On November 20, 2009, Plaintiff saw Dr. Robert Conway at the University of Missouri Physical Medicine and Rehabilitation Clinic.  (Tr. 288–89.) Dr. Conway noted that Plaintiff recently had lab tests with normal results, ruling out a connective tissue disorder.  (*Id.*)  The plan was to treat Plaintiff with physical therapy, but she stated she "has not had time to get into physical therapy but thinks she will be able to get into it in the next couple of weeks." (Tr. 289.)  Plaintiff also indicated that she was still too fatigued to increase her Cymbalta.  (*Id.*)

On July 16, 2010, Plaintiff sought evaluation for her wrist pain with Dr. Brian Schultz at Columbia Orthopaedic Group.  (Tr. 302–03.)  Plaintiff reported that her left wrist pain was worse than the right wrist, and she was right hand dominant.  (Tr. 302.)  She told Dr. Schultz that she had fractured her wrists in an accident in 1993, and she had wrist operations at Mayo Clinic several years later, with persistent pain since then.  (*Id.*)  She also reported that pain was limiting her abilities, particularly employment.  (*Id.*)  Dr. Schultz noted that "[i]t has been recommended to her that she pursue disability status.  She reports that after her original surgery she was told she had a 7% disability of the wrist."  (*Id.*)

(Footnote Continued from Previous Page)
*Diagnosing Immune Disorders and Allergies*, Wellness.com, *available at* http://www.wellness.com/reference/allergies/diagnosing-immune-disorders-and-allergies (last visited March 11, 2014).

Upon examination, Plaintiff had forty degrees extension of the left wrist and thirty degrees flexion, which caused quite a bit of pain.  (*Id.*)  In her right wrist, she had seventy degrees of extension and eighty degrees of flexion.  (*Id.*)  Her strength, sensation, and reflexes were normal.  (*Id.*)   And her left wrist x-rays showed significant degenerative changes, while her right wrist x-rays were normal.  (*Id.*)  Dr. Schultz agreed with Dr. Eckenrode's prior recommendation for ulnar shortening osteotomy and possible decompression, but Plaintiff stated she was not ready to do so.  (Tr. 302–03.)  Dr. Schultz gave Plaintiff some samples of Celebrex and also recommended taking Extra Strength Tylenol four times a day. (*Id.*)  He encouraged Plaintiff to wear braces on her wrists at night, and otherwise use her wrists for range of motion as much as possible.  (*Id.*)

Plaintiff kept a diary of her pain from July 27–31, 2010.  (Tr. 161–67.)  She noted that wrist pain caused her to have difficulty holding objects, driving, typing, and sleeping.  (Tr. 161–63.)  In addition, low back pain made her restless at work.  (Tr. 163.)  She noted that wrist pain slowed her productivity, and household chores and personal grooming also hurt her wrists.  (Tr. 163–67.)

Plaintiff attended counseling monthly from May 28, 2009, through December 2010.  (Tr. 374–96.)  She was treated primarily for marital problems. (*Id.*)  Of significance to the ALJ in his decision, Plaintiff's therapy notes indicated that Plaintiff had traveled from Missouri to Minnesota in December 2009, to visit family.  (Tr. 383.)  She also traveled to Chicago, Illinois in November 2010, to take her dog to have surgery.  (Tr. 374.)  In addition, Plaintiff's therapy records

8

revealed she had a Facebook page, suggesting that she used a computer. (Tr. 375.)

For evaluation of her social security disability claim, Plaintiff underwent a consultative psychological examination by psychologist Mark Schmitz on October 18, 2010.  (Tr. 337–41.)  Plaintiff drove herself to the appointment. (Tr. 337.)  She explained to Mr. Schmitz that she dropped out of high school as a senior and did not obtain a GED, and that most of her past work was data entry. (Tr. 338.)  She stated that she recently worked for three months typing insurance policies, employed by a temporary agency, but she quit due to increasing problems with her wrists.  (*Id.*)

Plaintiff reported that she was in an automobile accident at age thirteen and broke her wrists when trying to stop from hitting the seat in front of her.  (*Id.*) She described her wrist limitations as follows: she needs help to push a grocery cart; she cannot type; she cannot lift her nine-pound dog; she can only play computer games for ten minutes; she is limited in writing; she cannot sew; and her wrists get tired quickly from holding a book to read.  (Tr. 339.)  Plaintiff also reported that she had low back pain that sometimes prevented her from getting out of bed, and that her husband had to help her get dressed.  (*Id.*)  She stated that her knees also hurt.  (*Id.*)  She explained that in 2009, she was diagnosed with fibromyalgia and prescribed Cymbalta, but the medication worsened her depression.  (*Id.*)  She also indicated that pain medications had not helped her wrists or back.  (*Id.*)

9

Plaintiff told Mr. Schmitz that she started seeing counselors for depression at age six. (*Id.*) She had tried a number of different antidepressants, but they made her depression worse, making her feel suicidal. (*Id.*) Plaintiff stated she was in her second marriage but was separated from her husband (Tr. 339–40), and she was staying with friends at the time of the interview. (Tr. 340.)

Upon mental status examination, Mr. Schmitz noted that Plaintiff's speech, thoughts, and mannerisms were normal. (Tr. 340.) She was oriented, and she correctly performed concentration and memory tasks. (*Id.*) She described her mood as lost and confused, and that she felt overwhelmed and depressed, with frequent crying spells, and poor appetite and sleep. (*Id.*) She stated that chronic wrist pain contributed to her sleep problems, and the only medication she was taking was to help her sleep. (*Id.*) Mr. Schmitz diagnosed Plaintiff with major depressive disorder, recurrent and severe, and he assessed a GAF score of 45.[5] (Tr. 341.) He felt Plaintiff would be capable of understanding and remembering instructions, but he noted that she was likely to have at least moderate difficulty sustaining concentration and persistence in tasks, due to depression and

---

[5]  The Global Assessment of Functioning Scale ("GAF"), a numeric scale of 0 to 100, is used by clinicians to rate the social, psychological, and school functioning of patients. *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-tr") 32 (American Psychiatric Association 4th ed. text revision 2000). Scores from 41 to 50 indicate serious symptoms (e.g., suicidal ideation, severe obsessional traits, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

distraction caused by pain.  (*Id.*)  Mr. Schmitz also noted that Plaintiff appeared capable of socially appropriate interactions.  (*Id.*)

Upon the advice of her attorney, for the purpose of supporting her social security disability claim, Plaintiff established care at the Olmsted Medical Center. (Tr. 453.)  On December 19, 2011, Plaintiff was examined by Nurse Michelle Higgins.  (Tr. 453–55.)  Plaintiff reported she was pursuing disability for fibromyalgia and chronic back pain.  (Tr. 453.)  Higgins noted that Plaintiff was pleasant, alert, oriented, and in no acute distress.  (Tr. 454.)  Plaintiff described symptoms of daily pain, crying episodes, difficulty sleeping, little interest or pleasure, hopelessness, poor energy, difficulty concentrating, and poor self-esteem.  (Tr. 453.)  Plaintiff's physical examination was normal.  (Tr. 454.)  Higgins noted that Plaintiff wanted further evaluation of her depression and fatigue.  (Tr. 455.)

In March 2012, Nurse Higgins treated Plaintiff for a flare of wrist and back pain.  (Tr. 462–63.)  Plaintiff reported that chiropractic treatment and the medications Flexeril and Vicodin had been modestly helpful, but she stated she was not taking any medication on a regular basis.  (Tr. 462.)  On examination, Plaintiff had full strength in the upper and lower extremities, and pain with range of motion exercises of her wrists.  (*Id.*)  Nurse Higgins prescribed a muscle relaxant and a short supply of Vicodin.  (Tr. 463.)  She also recommended Lyrica for fibromyalgia, but Plaintiff preferred to use it on an as-needed basis, which Higgins thought was a reasonable way to treat pain flares.  (*Id.*)

On April 18, 2012, Nurse Higgins completed an "Upper Extremity Fractures Treating Physician Data Sheet," in support of Plaintiff's social security disability claim.  (Tr. 465–73.)  Therein, Higgins opined that Plaintiff had the following limitations: (1) stand and/or walk no more than one hour in an eight-hour workday (based on fibromyalgia); (2) lift and carry less than ten pounds occasionally; (3) rarely push and pull with the arms; (4) never climb ladders or poles; (5) never use arms for overhead work; (6) never use hands to operate controls; (7) never perform finger-thumb apposition at normal speed; and (8) never use hands to operate a keyboard, calculator, or handle small parts.  (Tr. 469–71.)  Higgins noted that Plaintiff preferred not to use medications because they caused sedation and did not significantly improve her pain.  (Tr. 467.)

**B.     State Agency Physician Opinions**

On November 1, 2010, Dr. Mark Altomari reviewed the medical records in Plaintiff's social security disability file, upon initial evaluation of her disability claim.  (Tr. 343–53.)  He completed a "Psychiatric Review Technique Form," opining that Plaintiff had an affective disorder that caused mild difficulty in activities of daily living, no difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 343, 351.)  He also completed a "Mental Residual Functional Capacity Assessment" form.  (Tr. 354–56.)  He opined that Plaintiff could understand, remember, and carry out simple work instructions, maintain adequate attendance, sustain an

ordinary routine without special supervision, interact adequately with peers and supervisors, and adapt to most changes in a competitive work setting.  (Tr. 356.)

Dr. Kim Miller reviewed Plaintiff's social security disability file on November 2, 2010, and completed a "Physical Residual Functional Capacity Assessment" form to evaluate Plaintiff's disability claim.  (Tr. 357–62.)  She opined that Plaintiff's degenerative joint disease, fibromyalgia, and degenerative disc disease caused the following limitations: occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; sit, stand, and/or walk six hours in an eight-hour day; left hand limited to occasional handling; never climb ladders, ropes, or scaffolds; and limit the following to occasional – climb ramps/stairs, balance, stoop, kneel, crouch, and crawl.  (*Id.*)  Dr. Miller also opined that Plaintiff should avoid concentrated exposure to vibration.  (Tr. 360.)

## III.     Testimony at the Administrative Hearing

### Plaintiff's Testimony

Plaintiff, represented by counsel, testified as to the following at the hearing before the ALJ on March 21, 2012.  (Tr. 65–85.)  She is right-handed, five-feet-four-inches tall, and weighs 170 pounds.  (Tr. 68.)  At the time of the hearing, she was separated from her husband and lived by herself.  (*Id.*)  She finished high school without getting her high school diploma because she did not complete all of her coursework.  (*Id.*)  Plaintiff testified that she cannot work because she has wrist pain that affects almost every daily activity.  (Tr. 69–70.)  She also has back pain making it difficult to bend and get dressed.  (*Id.*)

Plaintiff testified that when her wrist pain was severe, she used her knees to steer her car. (Tr. 69.) She needed assistance with grocery shopping and would even ask strangers to put things in her cart. (*Id.*) Her left wrist was worse than her right, but her right wrist pain was at a level of six or seven out of ten. (Tr. 70.) She stated that she had to use a wheeled hamper to roll her laundry to the laundry room, and she used to sew to earn extra money but could no longer do so. (*Id.*) She also stated that she had trouble getting out of bed when her back pain was severe. (*Id.*)

Plaintiff testified that after her wrist surgeries, she was told to expect to have arthritis, and to treat arthritis, she was told to take ibuprofen. (Tr. 71.) When ibuprofen did not help, she was not given another medication. (*Id.*) At some point before the hearing, she tried cortisone shots, but she stated the effects had already worn off. (*Id.*) She stated she was recently prescribed an anti-inflammatory medication that was not helping and caused dizziness. (Tr. 71, 75–76.) She was also taking Flexeril, which relieved some of her back pain but caused extreme fatigue. (Tr. 76.) She was also recently prescribed Vicodin. (Tr. 71. 75.)

Plaintiff testified that she had worked for a temporary agency, and she had two assignments at Shelter Insurance in 2010. (Tr. 72.) The first assignment ended, and when she went back for another assignment, she asked for part-time work because her wrists hurt. (*Id.*)

Plaintiff's daily routine involved waking up at 9:00 a.m. to take her dogs out, if her back was not hurting too much. (Tr. 73–74.) Then, it took her a long time to wash a few dishes and have something for breakfast. (Tr. 74.) She stated that her friends checked on her daily. (*Id.*) It took her forty-five minutes to shower because her wrists hurt. (Tr. 77.) And she often did not change out of her pajamas because it was difficult to dress. (Tr. 77–78.) Plaintiff stated that she did not read much anymore because it was too painful to hold the book and turn the pages. (*Id.*) She painted her nails infrequently, and her friends often did her hair for her. (Tr. 78–79.) She testified that she tried to do a little housework but could not do very much, and that back and wrist pain prevented her from sleeping well. (Tr. 74, 76.)

**<u>Medical Expert's Testimony</u>**

Dr. Robert Beck testified at the hearing as a medical expert. (Tr. 56, 79–81.) He testified that Plaintiff's impairments included bilateral wrist pain and degenerative joint disease with impingement in the wrist. (Tr. 79.) He also testified that Plaintiff had low back pain secondary to degenerative disc disease, fibromyalgia, polycystic ovary syndrome, depression, and possible somatoform disorder. (*Id.*) Dr. Beck testified that Plaintiff's impairments did not meet or equal a listed impairment. (Tr. 80.) He opined that Plaintiff could perform sedentary work, sitting for six hours and changing positions every thirty or forty-five minutes. (*Id.*) He also opined that she could frequently lift ten pounds, and use her hands frequently but not constantly. (*Id.*) He stated that her back pain would

limit her to occasional stooping, crawling, and crouching.  (*Id.*)  If she used

Vicodin, Dr. Beck stated that she would need to avoid ropes, ladders, scaffolds,

and unprotected heights.  (*Id.*)  In forming his opinion that Plaintiff could perform

sedentary work using her wrists, Dr. Beck relied in part on a medical record of

December 2011, indicating that her main problems were fibromyalgia and

depression, not wrist problems.  (*Id.*)

## Vocational Expert's Testimony

A vocational expert, Steve Bosch, also testified at the hearing.  (Tr. 82,

277–84.)  The ALJ told Bosch to assume a hypothetical individual of Plaintiff's

age and work background, who would be limited to sedentary work, changing

position every thirty to forty-five minutes, avoiding work around dangerous,

exposed, moving machinery and unprotected heights.  (Tr. 82–83.)  The

individual would be limited to simple and not complex or detailed work; no

climbing ladders, ropes, or scaffolds; and only occasional balancing, stooping,

kneeling, and crouching.  (Tr. 83.)  She could use her hands frequently but

without constant fingering.  (*Id.*)  And she could not use equipment that caused

vibration.  (*Id.*)  Bosch testified that such a person could not perform Plaintiff's

past work.  (*Id.*)

Bosch, however, also testified that the hypothetical person could perform unskilled work as an optical final assembler[6] and a semi-conductor bonder[7] in electronics assembly.  (*Id.*)  But if the hypothetical individual was also limited to use of only the dominant hand, Bosch testified that she could not perform the occupations he had identified.  (Tr. 84.)  He testified that the jobs required frequent fingering and fine dexterity, and would not be possible if the individual were limited to occasional use of the upper extremities.  (*Id.*)

## IV.   The ALJ's Findings and Decision

On March 29, 2012, the ALJ issued a decision concluding that Plaintiff was not under a disability.  (Tr. 48–60.)  The ALJ followed the five-step evaluation set out in the Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The Eighth Circuit Court of Appeals has summarized the five-step evaluation process as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform

---

[6]     Dictionary of Occupational Titles ("DOT") Code 713.687-018, with approximately 500–700 jobs in Minnesota.

[7]     DOT Code 726.685-066, with approximately 3,000 jobs in Minnesota.

his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable
to perform his or her past relevant work then the burden is on the Commissioner
"to prove that there are other jobs in the national economy that the claimant can
perform." *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998) (citation omitted).

The ALJ found that Plaintiff had not engaged in substantial gainful activity
since her alleged onset date of April 1, 2009. (Tr. 53.) At step two, the ALJ
found that Plaintiff had the following severe impairments: arthritis, degenerative
disc disease, fibromyalgia, obesity, and depression (20 C.F.R. § 404.1520(c)).
(*Id.*) And at step three, the ALJ determined that Plaintiff's physical and mental
impairments did not meet or medically equal one of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 53–55.) Specifically, the ALJ
stated that Plaintiff did not meet the "B criteria" of Listing 12.04. (Tr. 53–54.) The
ALJ determined that Plaintiff did not satisfy the paragraph B criteria of these
listings because she had only mild restrictions in activities of daily living because
she took care of her dogs; she went grocery shopping with assistance; she had
limitations in personal care; she handled her finances; she did laundry with help;
and she traveled to Chicago. (Tr. 54.) She also "worked at the shelter around
Thanksgiving 2010."[8] (*Id.*) In social functioning, the ALJ found that Plaintiff had
mild difficulties because she went to church and to a mall, she did not have
difficulty getting along with others, and she traveled to Minnesota in

---

[8]     The ALJ mistook Plaintiff's work at Shelter Insurance for working at a
shelter.

December 2009, to visit family and friends.  (*Id.*)  The ALJ concluded that

Plaintiff had moderate difficulties in concentration, persistence, or pace because

she could use a computer and drive a car, read the bible, finish tasks, and follow

instructions.  (*Id.*)  In addition, she recently read a book, and her mental status

examination was normal at her consultative examination.  (*Id.*)

> At step four, the ALJ found that Plaintiff had the RFC to perform –
>
> sedentary work as defined in 20 CFR 404.1567(a) except with the
> ability to change positions every thirty to forty-five minutes, avoid
> dangerous moving machinery and unprotected heights, performing
> simple work that is not complex or detailed, no use of ladders, ropes
> or scaffolds, occasional balancing, stooping, kneeling and crouching,
> with frequent but not constant use of the hands/fingers, performing
> no work that has vibrating equipment.

(Tr. 55).  In reaching this RFC determination, the ALJ gave great weight to

Dr. Beck's testimony, finding his opinion to be consistent with the record, and

finding Dr. Beck to be an expert familiar with analyzing disability under the

regulations.  (Tr. 56.)  The ALJ found that the objective medical records, the

course of Plaintiff's treatment, and her conservative use of medications did not

support disability.  (*Id.*)  The ALJ noted that Plaintiff's low back pain was present

since high school and did not radiate to her extremities or cause focal weakness.

(*Id.*)  Her gait, strength, reflexes, sensation, and straight leg raise tests were

normal.  (*Id.*)  She was diagnosed with fibromyalgia or somatization and

depression.  (*Id.*)  And she was treated with Cymbalta and physical therapy.  (*Id.*)

The ALJ also pointed out the following.  One month after the prescribed

treatment for fibromyalgia, she was somewhat improved but would not increase

Cymbalta due to side effects.  (*Id.*)  She had not started physical therapy due to the cost, and her schedule.  (*Id.*)  In November 2009, her lab studies were normal, and Plaintiff had still not started physical therapy or increased her Cymbalta.  (*Id.*)  There was no significant stenosis from the disc bulge in her lumbar spine.  (Tr. 57.)  And Plaintiff's wrist pain was treated with Celebrex, Extra Strength Tylenol, and wrist braces.  (*Id.*)

The ALJ also reviewed the psychological consultative examiner's report and credited the examiner's opinion because it was consistent with Plaintiff's course of treatment, medications, daily activities, and the overall evidence. (Tr. 57.)  In addition, the ALJ noted that Plaintiff participated in counseling with Edna Farmer for a brief time but Plaintiff's conservative course of treatment was not consistent with an opinion of disability.  (*Id.*)  Furthermore, Plaintiff was generally described as pleasant, alert, and oriented.  (*Id.*)

The ALJ found that Plaintiff's daily activities supported the RFC finding. (Tr. 57–58.)  Plaintiff's activities included traveling to Chicago to take her dog for surgery, going to church, maintaining a Facebook page, traveling to Minnesota in December 2009, reading a book, and performing the activities described in her function report and in her spouse's third-party function report.  (*Id.*)  The ALJ also discounted Plaintiff's allegations because she had earnings[9] of $4,000.00 in 2010.  (Tr. 58.)  The ALJ credited Plaintiff's good work history but did not find that

---

[9]      Plaintiff's earnings records are found at Tr. 149–50.

she was disabled, in light of the absence of objective evidence supporting her allegations.  (*Id.*)

Ultimately, at step four of the disability determination procedure, the ALJ found that Plaintiff was not capable of performing her past relevant work.  (*Id.*) But at step five, based on the vocational expert's testimony, the ALJ found there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.  (Tr. 59.)  Thus, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Act, from April 1, 2009, through the date of the ALJ's decision.  (Tr. 60.)

## DISCUSSION

### I.   Standard of Review

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Gavin*, 811 F.2d at 1199 (quotation

omitted).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Id.*

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.     Analysis of the ALJ's Decision

Plaintiff makes three arguments in support of her motion for summary judgment: (1) the ALJ failed to give proper consideration to the RFC opinion of her treating nurse and other opinions; (2) the ALJ erred in his credibility analysis; and (3) the ALJ erred in finding she has the residual functional capacity to use her hands for frequent fingering.

An ALJ determines RFC by considering all evidence in the record, weighing physician and other providers' opinions, and assessing credibility. *Pearsall v. Massanari*, 274 F.3d 1211, 1217–18 (8th Cir. 2001).  Treating physicians' opinions are entitled to controlling weight if "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with other substantial evidence in the record.  *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007) (quoting *Prosch v Apfel*, 201 F 3d 1010, 1012–13 (8th Cir. 2000)).  An ALJ may give less weight to a physician's opinion if the opinion is based largely on the claimant's subjective complaints rather than on objective medical evidence.  *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).  A nurse is not an acceptable medical source whose medical opinion is entitled to controlling weight, but a nurse's opinion is entitled to consideration concerning the severity of the claimant's impairments, and how the impairments affect the ability to work.  *See Lacroix v. Barnhart*, 465 F.3d 881, 886–87 (8th Cir. 2006).

A claimant's subjective complaints cannot be discounted solely on the basis of lack of objective findings to support the severity of her complaints.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  An ALJ must consider, but need not discuss, each of the following factors in making a credibility assessment: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.  *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009). When an ALJ provides good reasons for his credibility finding, courts should defer to that finding, because the ALJ is responsible for deciding questions of fact.  *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).

Plaintiff asserts that in July 2010, her wrist condition was severe enough that physicians at Columbia Orthopaedic Group recommended that she apply for disability.  Plaintiff, however, misconstrues the record.  When Plaintiff saw Dr. Schultz on July 16, 2010, he wrote "[i]t has been recommended to her that she pursue disability status.  She reports that after her original surgery she was told she had a 7% disability of the wrist." (Tr. 303.)  There is no indication of who recommended disability, when, or why.  The statement by Dr. Schultz is not a treating physician's opinion on Plaintiff's ability to work.  Dr. Schultz recommended that Plaintiff wear braces on her wrists at night, but otherwise recommended she should use her wrists for range of motion as much as possible.  (Tr. 303.)

Plaintiff's wrist injuries occurred in 1993, and she underwent wrist surgeries in 1995 and 1996.  (Tr. 406.)  In 1998, Plaintiff's only functional complaints regarding her wrists were limitations in performing cartwheels, push-ups, and pull-ups.  (*Id.*)  Dr. Amadio, Plaintiff's surgeon, told Plaintiff she would not be doing any harm to her wrists by doing an activity that caused only mild discomfort, even if the activity was vigorous.  (*Id.*)  Thus, Plaintiff worked in data entry from February 1999 through September 2007.  (Tr. 231.)  She then worked as a receptionist and administrative assistant, from October 2007 through March 2009, followed by two temporary positions in 2009 and 2010.  (Tr. 231.)  There is no indication in the record that she was given any work restrictions throughout her employment.  And there are no treating physician opinions of disability in the record.

It is true that an ALJ must also consider a nurse's opinion.  Plaintiff made an appointment for an annual examination with Nurse Higgins in December 2011, at the behest of her attorney and for the purpose of establishing care to support her social security disability claim after she moved to Minnesota.  (Tr. 453–55.)  She told Higgins that she was pursuing disability for fibromyalgia and depression.  (Tr. 453.)  Plaintiff did not endorse wrist pain during the examination, although she reported a history of bilateral wrist surgery following wrist fractures.  (Tr. 454.) When Plaintiff saw Higgins a second time in March 2012, she complained of wrist and back pain.  (Tr. 462–63.)  In April 2012, Higgins completed a disability assessment form for Plaintiff.  (Tr. 465–73.)

Important here, the ALJ could not have considered Higgins' opinion, because the form was completed and provided to the Appeals Council *after* the ALJ issued his unfavorable decision on Plaintiff's claim in March 2012.  The Appeals Council considered the new evidence submitted by Plaintiff but denied review of the ALJ's decision.  (Tr. 1–5.)  Under these circumstances, the court's task is to "decide whether the ALJ's decision is supported by substantial evidence in the records as a whole, including the new evidence deemed material by the Appeals Council that was not before the ALJ."  *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995).

Plaintiff only saw Higgins for treatment once before requesting a disability opinion.  (Tr. 453–55, 462–73.)  Under the regulations, even an acceptable medical source is not considered a treating source if the relationship is based on the need to obtain a report in support of disability.  20 C.F.R. § 404.1502. Therefore, this weighs against crediting Higgins' opinion.  In addition, in her assessment of Plaintiff, Higgins wrote:  "even [lifting] a gallon of milk causes aggravation of pain, she feels that half gallon is tolerable"; and "is unable to reach overhead to fix hair/put hair in ponytail."  (Tr. 469–70.)  But an ALJ is entitled to give less weight to an opinion that was based largely on the claimant's subjective complaints rather than on objective medical evidence.  *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).

Substantial evidence in the record, including the credibility analysis discussed below, is inconsistent with Higgins' RFC opinion for the following

reasons: (1) Higgins did not give Plaintiff work restrictions during the course of treatment; (2) Higgins' opinion of Plaintiff's limitations was not supported by objective testing; (3) Higgins' opinion was inconsistent with Plaintiff's conservative course of treatment; and (4) Higgins' opinion was inconsistent with Plaintiff's ability to perform two temporary terms of employment in 2009 and 2010. *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (stating that medical source statement was properly discounted where restrictions were never mentioned in the treatment records; objective tests showed mild impairments; records indicated control of pain with medication; and weight of the record was more consistent with another medical opinion).

Further, the Court concludes that the ALJ properly discounted Plaintiff's credibility based in part on the lack of objective findings to explain her allegations of severe pain in her wrists and back.  Plaintiff complains she cannot use her hands but there are no objective findings to explain pain in her right wrist, her dominant hand.  (Tr. 302, 454.)  And, during the relevant time period, Plaintiff did not show objective signs of distress from pain when she sought medical treatment, apart from endorsing pain with range of motion testing of her wrists. (Tr. 292, 296, 400, 454, 462.)  In fact, she had full strength in her hands. (Tr. 297, 302, 462.)

In addition, the ALJ properly relied on Plaintiff's conservative course of treatment in discounting her credibility.  Until one week before her disability hearing, Plaintiff primarily treated her wrist pain with over-the-counter medication.

(Tr. 72, 371.)  She treated her fibromyalgia on an as needed basis, rather than taking a regular prescription medication, although she admittedly had some improvement with Cymbalta in July 2010.  (Tr. 289, 292, 463.)  Plaintiff declined to increase her Cymbalta because it caused fatigue, but this is inconsistent with her complaint of pain so extreme she could not get out of bed some days. (Tr. 289, 292.)  Also, Plaintiff did not participate in recommended physical therapy, explaining that she was too busy to schedule it.  (Tr. 289, 292.)  And although Plaintiff had some degenerative changes in her left wrist, she declined surgical treatment despite her allegations of severe pain limiting all her activities. (Tr. 303, 372–73.)  The ALJ also properly discounted Plaintiff's credibility because, after her alleged disability onset date, she worked two temporary jobs that required use of her wrists.  All of these facts are inconsistent with Plaintiff's complaints of disabling pain.  *See Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009) (stating that ability to manage pain with limited use of prescription medications and over-the-counter Tylenol is inconsistent with disabling level of pain); *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (stating that failure to follow a recommended course of treatment weighs against credibility); *Dunahoo v. Apfel*, 241 F.3d 1033, 1038–39 (8th Cir. 2001) (stating that performing household activities, errands, and working part-time while applying for disability was inconsistent with complaint of disabling pain).

Plaintiff contends that the ALJ's conclusion that she can perform frequent fingering with her hands is not supported by substantial evidence in the record.

Specifically, she asserts that the ALJ's finding was based on the testimony of Dr. Beck, but that Dr. Beck acknowledged his opinion was based exclusively on one medical record from December 2011. Plaintiff overstates Dr. Beck's reliance on one medical record. Dr. Beck identified the objective findings of Plaintiff's impairments, establishing that he considered all the medical records. (Tr. 79–80.) In addition, it was reasonable for Dr. Beck to consider the fact that Plaintiff did not report wrist pain when she underwent an annual physical examination with Nurse Higgins in December 2011. One would expect a person to report all sources of debilitating pain when establishing care with a new provider. But Plaintiff only told Higgins she was pursuing disability based on fibromyalgia and depression.

While it is true that Plaintiff complained of wrist pain on her second visit to Nurse Higgins, the ALJ gave good reasons to discount the credibility of Plaintiff's subjective complaints of pain. Dr. Beck's testimony, the objective medical findings, and Plaintiff's overall course of treatment are substantial evidence supporting the ALJ's RFC determination. *See Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004) ("It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment."). In addition, the ALJ incorporated his RFC finding into a hypothetical vocational question posed to a vocational expert. "Testimony from a VE based on a properly-phrased hypothetical question constitutes substantial evidence." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996).

29

Therefore, the ALJ's determination that Plaintiff was not under a disability from

April 1, 2009, through March 29, 2012, was proper.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 14), is **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 26), is

**GRANTED**; and

3.      The case is **DISMISSED WITH PREJUDICE**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date: March 20, 2014            __*s/ Jeffrey J. Keyes*_____
                                JEFFREY J. KEYES
                                United States Magistrate Judge